Thank you and good morning. May it please the Court, Jeff Johnson for Appellant State in Missouri. The Missouri River is a vital natural resource that has to be carefully managed for all the stakeholders that take water, either for navigation, flood control, recreational uses, or for the preservation of wetlands. An issue in this case is whether Federal agencies failed to properly consider the environmental impacts that a 40-year water contract would have on the Missouri River, thus violating the National Environmental Policy Act, and whether the Federal agencies were required to comply with the Water Supply Act before issuing this long-term contract that would guarantee a water supply for municipal industrial purposes from the Missouri River Reservoir. The District Court erred in deciding that a finding of no significant impact by the Bureau of Reclamation and the Federal and that the agency was relying on studies and previous EISs that relied on outdated data. The Court then further erred by using the decision that a finding of no significant impact was justified to then also find that the Water Supply Act had been violated. In the Court's failure to apply the legal standard in the Water Supply Act requires a remand. As the first question is more fact-based, I'll turn to the second question first. Council, before you get to your points, I have a question that kind of goes to something that is an overarching question from my standpoint and provides some context. Does it, as an requirement, in order for the state of Missouri or for the downriver states to really be able to complain about these issues, that this has to be some kind of a significant risk? That is to say that inconsequential diversions of water, for example, from these lakes would not be something that would be subject to objection. That is number one. Second, just looking at the facts here, isn't this really just an inconsequential, very very minor diversion of water, 20 cubic feet per second, and being drawn from these lakes at a level that it would take almost a catastrophic drought in order for that amount of water to make any difference to the downriver states? Sorry. Yes, Your Honor. To answer your first question, the case here is whether or not the federal government issued the final Environmental Assessment Act and made the finding of no significant impact based on outdated data that was relied on in the 2013 cumulative impacts analysis that the federal appellees had used for the Northwest Area Water Project Supply. Additionally, they then also attached the 2009 federal EIS that was used for when this project was originally a federal project at 122 cubic feet per second. The main issue, at least as we are turning to the NEPA side for this, you actually don't need a substantial injury, so to speak, for arbitrary and capricious review. You just need to be injured by the agency's failure to consider these impacts. And what Missouri has stated is that no, these are not in fact minor impacts to the State of Missouri, that each time you take 1 percent from a lake and you take another 1 percent of what's left, you continue to take 1 percent. This is essentially this idea of a loss by 1,000 paper cuts. So to answer your second question, I believe the issue here is that whether or not there is a substantial impact or not really goes to the issue of how the agency looked at this problem. And I think the agency's brief rightfully shows that in the environmental assessment report, in its finding of no significant impacts, that the agency essentially took the view that your Honor has, which is that, oh, this is similar to this other project that we did, the Northwest Area Project. This is similar to the Federal Red River Valley Project that didn't actually proceed, that has now become the State project. But what the outdated data that at least the State of Missouri points out is that the Federal Red River Valley Project was originally only 122 CFS. And that now, if you look at both the water contract and the federal, which its sole purpose is to feed water into the expanded State Red River Valley Project, it goes from 122 CFS to a total of 165 CFS. That's a 35 percent increase and at least the agency's sort of acknowledged that it had grown. But it actually hasn't studied the problem. What's wrong with the 2013 study? Why is it insufficient or inappropriate to rely on that? Because it still has the State project at a lower level than what it currently was for the water contracted issue here. Couldn't they rely on the same underlying data and adjust it for the increased water flow? The agency certainly can study it and decide that this additional water would be sufficient but just by merely attaching these things and relying on this idea that without really addressing or finding that there would be no impacts from this increase, which is a little more than a third, the agency hasn't really looked at the issue. I think the agency has to give a look at what the increase would potentially do. Then turning to the Water Supply Act issue, the Water Supply Act applies just like many of the other statutory governing authorities here. It's just one of many, as the United States and appellees point out. But here, the Water Supply Act applies because federal agencies are attempting to provide long-term water supply from the controlled reservoirs without a permanent storage allocation. As this Court has recognized in citing to the U.S. Supreme Court, the Missouri River Systems Reservoir is cited, the primary purposes for it are for flood control and navigation, and that's South Dakota versus Uplody. Counsel, I've got a question about the State of Missouri's position on this. As I understand Missouri's briefs, well, first of all, the Water Supply Act uses the term or phrase reservoir project. And as I understand your briefs, it's your position that the reservoir project that the Central North Dakota Project allegedly modifies is the entire Missouri River Main Stem Reservoir System. Could you explain the basis for that, and why are we not looking at just one project rather than the whole system as the reservoir project at issue under the Water Supply Act? Excuse me, Your Honor. My understanding is that what it is, it's at least modifying the Missouri River Reservoir System at the Lake Sakakawea Station and from there going down. So why is that not the reservoir project rather than the entire Missouri River Main Stem System? You're talking for definitional purposes. So at least as far as Missouri is concerned, that the Corps had issued for the whole system certainly applies for each individual project within it. If the whole system's primary purpose is for flood control and navigation, then certainly those have to be the primary purposes for all their individual ones that support the primary purposes. So that would be Missouri's position for your definitional question. In here, what the District Court did find is that, and also the environmental assessment, this is on page I think 9 and 10 of the District Court's opinion, was that the EA recognized that there isn't any municipal or industrial storage that's already allocated for this engineering reg. The Army Corps of Engineers Regulation 11005-2100 especially requires the Corps to do a permanent reallocation for guaranteeing a long-term priority. That certainly has not happened here and that is recognized both by the District Court and I think also by the agency because what the agency has essentially said is that it has all these other authorities like the Dakota Water and Natural Resources Act and the Flood Control Act of 1944 and various other authorities that says we don't need to look at the water supply because it's just supplemental authority, as the tri-states case out of the 11th Circuit said. But the question here is really that the Corps has to first follow some regulations as to the engineering regulation and then also it's not necessarily that it's a supplemental authority here. It's that the Corps has to comply with all the statutory authorities of which the Water Supply Act is one of them. So here, because they have not addressed or have not made the permanent allocation for a 40-year contract, which cannot be really considered as temporary, which would go toward the Corps' authority to do surplus authority, right? So they can do sort of temporary allocations within the reservoir system. But to do a permanent allocation, the Corps has to actually go through and do it in such and such a way of rule-making. Counsel, with the McCluskey Canal already in place and pumping water from the lakes to the canals, how could this, the Central North Dakota project, create or constitute a major structural or operational change? Right, Your Honor. So the difference is that the McCluskey Canal itself provides water resources for areas close to that canal. The issue here is that the water contract authorizes a six-mile connection that connects the McCluskey Canal and also vitally the Lake Sacagawea water resources to the expanded State Red River Valley project, which is essentially why that six-mile connection doesn't actually serve or provide water for anything else. It's literally just connecting, at a lower cost for the people of North Dakota, the water from the McCluskey Canal to the State Red River Valley one. And so it represents a take from Lake Sacagawea, which is being pushed into the expanded State Red River Valley project that I think everyone, that the District Court acknowledged sort of co-mingles the water from the Missouri River with other water taken from the Missouri River. And at least some of that, even according to the environmental assessment project, will then get pumped over into the Hudson River Valley Basin. And with that, I will reserve the balance of my time. Very well. You may. Thank you for your argument. Thank you. Mr. Biese, are we going to hear from you first? Good morning, Your Honors. May it please the Court. John Biese on behalf of the Federal Defendants. This case is part of a larger, longstanding dispute regarding the question of upriver versus downriver use of water in the Missouri River Basin. Congress authorized Interior and the Garrison Diversion Unit to construct water supply projects to meet municipal and industrial needs in North Dakota. The Central North Dakota project at issue here is a small water supply project intended to meet anticipated industrial need in six Central North Dakota counties within the Missouri River Basin. And to provide some context for how small this project is, the Upper River Missouri Basin Reservoir System in total loses more water on average to evaporation in two days than this project can draw down at the maximum rate for an entire year. And it's unlikely that it would actually draw the maximum rate continuously. That's just a peak demand. The Bureau engaged in a robust assessment of the potential environmental impacts of this project. It considered the relevant areas of environmental concern and it reached a reasoned and reasonable decision that there would be no significant impact. This EA and the finding was a culmination of a two-year administrative process which afforded interested parties four opportunities to provide comments. The Bureau's environmental assessment extensively considered cumulative and downstream impacts contrary to the State of Missouri's arguments. The Bureau reviewed and incorporated the best and most comprehensive analysis available, the Army Corps' 2013 Cumulative Impacts Analysis and the 2015 Final Supplemental EIS for the Northwest Area Water Supply Project, which also draws water from the McCluskey Canal. Those analyses considered the past, present, and reasonably foreseeable future depletions on the Missouri River system. They ran those depletions against historical data for the Missouri River's inflows over the past 80 years to see if those depletions would have had a significant impact. And for this project in particular, the Central North Dakota Project, the Bureau explicitly considered whether the data remained valid and it considered whether there should be any changes to the reasonably foreseeable anticipated future projects. And on the latter, although there were some changes, some projects were larger, as my colleague noted, other projects dropped off, and the Corps concluded that the net effect was essentially no change to the depletions in the analysis. And you can see that in the administrative record in the appendix at 460 to 462, sorry, in the administrative record at 395 in the finding of no significant impact, that they concluded that there was no impact. So this question of 122 versus 165 CFS that counsel raised, that was accounted for when the Bureau considered the net balance of the anticipated future projects. So, counsel, as I understand it, this project does take about 15,000 acre feet of water per year. Right. And it effectively gives a priority for that water to the M&I water supply in North Dakota at the expense of downstream navigation interest. Why doesn't that require a reallocation under 43 U.S.C. Section 390B? Section 390B provides supplemental authority to the Corps and the Bureau to add water supply projects to reservoirs that didn't have water supply as part of the purpose. For instance, an old hydroelectric power project at the Buford Dam in Lake Lanier in Atlanta was primarily a hydroelectric project, so the question was whether they needed that supplemental authority to include water supply. Here, the Bureau is not relying on that supplemental authority to take this action. They are relying on the authority provided by the three Garrison Acts. So it is your position that it is already authorized by Congress to basically give a priority to this water use? Yes. In Section 7A1 of the Garrison District Unit Reformulation Act of 1986, it empowers the Bureau to instruct municipal, rural, and industrial water systems to serve areas throughout North Dakota. And the purpose and needs section of that statute, which is at Section 1A2, says the purpose of the statute was to meet the water needs of the state of North Dakota, and acting under that authority is amended by the Dakota Water Resources Act. The Bureau had ample authority to do this without relying on the Water Supply Act authority. So the Water Supply Act, in our view, is simply not relevant to this project because we're not using the supplemental authority it provides. And so, in our view, the impact of the State Red River Valley Water Supply Project, which counsel is concerned about, was properly considered in the cumulative impacts analysis here. It was one of the future anticipated depletions that was in the studies that the Bureau relied on and that is the appropriate context for this type of independent State project to be considered in an environmental assessment because it is not a connected action under the NEPA regs. It is not a Federal project, it is a separate independent State project. It is not interdependent in any ways. They serve separate purposes and they will proceed independently and the courts have recognized that agencies are not required to aggregate their actions with other non-Federal actions. So that was the whole point of the connected actions doctrine is to ensure that the Federal Government is not dividing up its projects into different pieces so that they can understate the environmental impacts. It is to make sure that all Federal actions on a project are considered together and the cumulative impact is understood. That was essentially the only argument Missouri offered for why EIS was necessary here, but it was based on this faulty premise that the Red River State project was a connected action. And if the Council has any questions, I would be happy to address them. All right. Thank you for your argument. Mr. Johnson, we will hear from you. Now, we will hear from Mr. Bennett Johnson first. May it please the Court, my name is Bennett Johnson and I represent the Garrison Diversion Conservancy District. This is my first time being here at the Eighth Circuit, so I thank you for the opportunity to appear. The Garrison Diversion joined into the Federal Defendant Appellee's Brief, so I don't need to repeat a lot of the things here, but I would like to emphasize a few points. Garrison Diversion was created by the State of North Dakota to oversee the realization of the Garrison Diversion Unit of the Missouri River Basin Project as authorized by the Flood Control Act of 1944. When originally authorized, North Dakota was promised over one million acres of irrigation as compensation for the 300,000 acres of prime farmland that was lost to the permanent flood through the creation of these dams. Over time, the focus on irrigation shifted to municipal, rural and industrial water supply, among other uses, as authorized through the Garrison Diversion Unit Act of 1965, the Garrison Diversion Reformulation Act of 1986 and the Dakota Water Resources Act of 2000. The Central North Dakota Water Supply Project would be one of the first projects to fulfill the purposes of these statutes. However, due to ongoing litigation, water resource development in North Dakota has been halted and stalled. As my colleague pointed out, once distilled to its core, this dispute, as evidenced through the record, is that Missouri opposes any consumptive use of Missouri River water by upper basin states. There is no amount of environmental review that would redress their objections to North Dakota's water supply development goals through the Missouri River. There has also been some confusion through the record of the various water supply projects that North Dakota has developed, or is proposing to develop, their alternative water supplies. North Dakota, through the Garrison Diversion, is looking at 165 CFS to use in Central North Dakota, 20 CFS in Central North Dakota, and 145 CFS eventually to the Red River Valley. Either it will be through the state project, 165 CFS, or 20 CFS through the Central North Dakota water supply in the McCluskey Canal as a cost-saving option. This is all within the administrative record. The Federal facilities are already constructed using water from the McCluskey Canal to serve water users within Central North Dakota. This is not an interbasin transfer of water. The Central North Dakota water supply is not an interbasin transfer of water. If it was, would that be prohibited? It wouldn't be prohibited. There would just be additional review pursuant to the Dakota Water Resources Act that if the Federal Government was looking to take water as authorized through the Dakota Water Resources Act, an EIS would need to be completed. And we've acknowledged that. And then in an alternative water supply, if we were through the Eastern North Dakota alternate water supply, there's an EIS done for that already that references the interbasin transfer issues. Again, the Central North Dakota supply is limited to in-basin use through engineering controls and metering and other engineering features of this water supply project. As touched on earlier, the Central North Dakota water supply project is a max 20 CFS water supply to serve Missouri River Basin water users. It's a cost-saving option. Again, the Federal facilities are already constructed. We need the water service contract through reclamation and the approvals to do additional construction power lines to get Flood Control Act preference pumping power, among some other approvals. The last point I would like to make, as my colleague has already pointed out, is that the Garrison's version is that the Water Supply Act of 1958 is inapplicable here. Through the Garrison Act, these three statutes I referenced earlier, the Garrison Diversion Unit Act of 1965, the Reformulation Act of 1986, and the Dakota Water Resources Act of 2000, Congress has already authorized municipal, rural, and industrial water supply for the people of North Dakota. Missouri's reading of the case law, particularly this tri-state rights case, as evidenced in the brief, is incorrect. I think the utilizing Enabling Act authority, such as these Garrison Acts, is sufficient. In this tri-state's right case, it was the Corps' position that the Enabling Act, this Rivers and Harbors Act, didn't provide for water supply. But then they had an alternative argument that even if it did, it wasn't enough to meet Georgia's water request. And I think the Corps, in that case, said you have to look at the Enabling Act, and then also, if you're still going to deny it there, you need to look at the Water Supply Act. Here, Reclamation identified initially that these Garrison Acts are sufficient for this water supply. So accordingly, the Water Supply Act is inapplicable here. Thank you. All right. Thank you, Mr. Johnson. We'll hear rebuttal from the State of Missouri. Thank you, Your Honor. So very quickly, I think we want to sort of highlight a couple of issues. The first is that the Federal authorities in both the Garrison Division, sorry, the District Court's reasoning for why the Water Supply Act did not apply. Under this Court's precedent, I think we all sort of agreed that the District Court got this wrong. And under this Court's precedent, I think it's under Kavanaugh that cited in our brief, this Court should remand for the Court to decide on first view which of these authorities should apply and whether or not there are any other factual issues that the Court would need to make its determination under the Act. The other thing that I also want to highlight is that the other statutory authorities that they are, that the Federal IPLEs and the Garrison Division are essentially relying on, these were all in effect when, as the District Court noted in footnote 6 of the brief, it's a carryover from I think pages 34 to 35, that all these were already in effect when, all these other authorities were already in effect when the Secretary, when the Reclamation Authority said that it would need to, for any of these like potential out of basin transfers, they would need to, it would need to comply with the Water Supply Act. So by failing to mention it in the environmental assessment or in the FONSI, the agency has essentially overruled its prior understanding of what authority it has under all these laws. And that is a sub salientio change that FCC v. Fox prohibits. It's also noted in the State Farm case from 1980 from the Supreme Court, they said that agencies may change, but when they change their mind, they do it to give a reason and tell us why. And with that, Your Honors, my time has expired and I would ask the Court to remand this case to the District Court for further proceedings. All right. Very well. Thank you for your argument. Thank you. Thank you to all counsel. The case is submitted and the Court will file a decision in due course. Counsel are excused.